# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of:

A white iPhone 8 cellular telephone, IMSI number 310150925580514, which is more fully described in attachment A.

)
)
)
)
)
)

Case No. 19-MJ-1293

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 21 U.S.C. §§ 841(a)(1) and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Luke Hepp, TFO
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 9/12/19

_____
Judge's signature

City and State: Milwaukee, Wisconsin

William E. Duffin , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF AN
## AN APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Luke Hepp, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation ("DCI"), and have been a sworn law enforcement officer for more than 10 years. I am currently assigned to the Wisconsin High Intensity Drug Trafficking Area ("HIDTA") Heroin Initiative. HIDTA is composed of law enforcement officers from federal and state law enforcement agencies. Since, 2014 I have been deputized as a federal task force officer with the United States Department of Justice, Drug Enforcement Administration ("DEA"). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.      In connection with my official DCI and DEA duties, I investigate criminal violations of the federal controlled substance laws, including, but not limited to Title 18, United States Code, Sections 1956 and 1957, Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963.  I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution,

transportation, storage, and importation of controlled substances. I have participated in the execution of multiple federal search warrants.

4.   I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States Currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

5.   I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

6.   Through training, experience, and discussions with other experienced agents:

a.   I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b.   I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

2

c.     I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d.     I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e.     I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f.     I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g.     I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h.     I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i.     I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

3

j.   I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.   I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l.   I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization; and

m.   I know drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession.

7.   In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

8.   I have participated in numerous complex narcotics investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. On many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

4

9.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

10.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

11.     The property to be searched is described as follows:

a.     A white iPhone 8 cellular telephone, IMSI number 310150925580514, hereinafter **"Device A;"**

12.     **Device A** is currently located at 801 W. Michigan Street, Milwaukee, Wisconsin.

13.     The applied-for warrant would authorize the forensic examination of **Device A** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### A. Background

14.     In March 2013, the Drug Enforcement Administration initiated an investigation into the drug trafficking activities of Clifton MORRISON, a.k.a "Rudy," and additional individuals. Collectively, these individuals are members of the MORRISON drug trafficking organization ("DTO"), which has distributed heroin and cocaine in and around the metropolitan area of Milwaukee, Wisconsin prior to 2013. The investigation revealed Clifton MORRISON was the leader of the Milwaukee-based MORRISON DTO. The organization acquired heroin and cocaine from multiple sources, some of whom were located in the greater Chicago, Illinois area, Las Vegas, Nevada, and El Paso, Texas. The source(s) either delivered, or arranged to have delivered, the heroin and cocaine at locations in Chicago, Illinois and southeastern Wisconsin.

5

MORRISON and other DTO members then transported the narcotics to Milwaukee, Wisconsin. The substances were prepared for distribution by DTO members, usually at a stash location, referred to as "the office," and subsequently provided to mid-level distributors for sale.

15.     The investigation, including court authorized monitoring of cellular phones used by DTO members, also revealed that Jose RODRIGUEZ distributed kilogram quantities of heroin and cocaine to MORRISON. In part, RODRIGUEZ obtained these substances from Pedro **MONARREZ JR.**, and other individuals. Jose RODRIGUEZ provided money owed to MONARREZ JR. for these drugs either directly or by providing it to a courier for **MONARREZ JR.**, Luis NEVAREZ, who then provided it to **MONARREZ JR.**, or **MONARREZ JR.'s** associate. Jose RODRIGUEZ subsequently distributed narcotics to other individuals, including Clifton MORRISON.

16.     On December 6, 2017, case agents executed numerous federal arrest warrants to include the arrests of Jose RODRIGUEZ, Miguel RODRIGUEZ, Clifton MORRISON, Samuel FLORES-MORALES, Luiz NEVAREZ, and others. Also on December 6, 2017, case agents executed numerous federal and state search warrants to include, in part, searches of MORRISON'S residences and "the office," two locations associated with Jose RODRIGUEZ, and other locations associated with DTO members.

17.     A search of Jose RODRIGUEZ's residence resulted in the seizure of more than 700 gross grams of cocaine, two firearms, ammunition, two cellular telephones, and other items of evidentiary value. Jose RODRIGUEZ is a convicted felon.

18.     A search of 4245 N. 52nd Street, Milwaukee, Wisconsin, "the office," resulted in the seizure of narcotics processing equipment to include a food processor, cutting agent, digital scales, strainers, hydraulic presses and blenders; documents; a loaded handgun with ammunition;

6

tow loaded rifles with ammunition; approximately 350 gross grams of heroin; approximately 90 gross grams of cocaine, and distribution amounts of marijuana.

19.     A search of 15XX Orchard Meadow Drive, Apartment X, Burlington, Iowa, located a cellular telephone assigned (319) 371-XXXX.  Melissa FLORES, Samuel FLORES-MORALES' wife, advised this phone was FLORES-MORALES' personal cellular telephone.

20.     On December 19, 2017, as a result on this investigation, a total of seventeen individuals were indicted by a federal grand jury in the Eastern District of Wisconsin.  Clifton MORRISON, Jose RODRIGUEZ, Miguel RODRIGUEZ, Luis NEVAREZ, and others were indicted on one count of conspiracy to distribute one kilogram or more of a mixture and substance containing a detectable amount of heroin, a schedule I controlled substance, and five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance.  MORRISON, Jose RODRIGUEZ, Miguel RODRIGUEZ and others were also indicted on substantive narcotics distribution counts.[1]

**B.     Court-Authorized Interceptions**

21.     On March 30, 2017, the Honorable J.P. Stadtmueller, United States Judge, Eastern District of Wisconsin, signed an Order authorizing the interception of wire and electronic communications over the cellular telephone assigned telephone number (414) 366-8706, Target Telephone #2.  The investigation revealed that this telephone was used by David WILDER.  During the court-authorized monitoring of these communications between March 30, 2017 and April 28, 2017, more than 296 intercepted telephone calls and text messages to or from Target Telephone #2 were deemed pertinent and criminal in nature.  These intercepted communications confirmed that David WILDER obtained heroin and/or cocaine from Clifton MORRISON.

---

[1] Charges against FLORES-MORALES were not presented to the grand jury as discussed below.

WILDER, in turn, distributed the narcotics to mid-level distributors as well as suspected street-level users. The interception authorized by the Order ended on April 28, 2017, with the implementation of the Order detailed in the following paragraph.

22.     On April 28, 2017, the Honorable J.P. Stadtmueller, United States Judge, Eastern District of Wisconsin, signed an Order authorizing the continued interception of wire and electronic communications over Target Telephone #2 and the initial interception of wire and electronic communications over the cellular telephone number (414) 759-3505, Target Telephone #4, used by Clifton MORRISON.     During the court-authorized monitoring of these communications between April 28, 2017 and May 27, 2017 more than 217 intercepted telephone calls and text messages to or from Target Telephone #2 were deemed pertinent and criminal in nature.  During the court-authorized monitoring of these communications between April 28, 2017 and May 27, 2017 more than 256 intercepted telephone calls and text messages to or from Target Telephone #4 were deemed pertinent and criminal in nature.  The interception authorized by the Order as to Target Telephones #2 and #4 ended on May 27, 2017 with the implementation of the Order detailed in the following paragraph.

23.     On May 31, 2017, the Honorable J.P. Stadtmueller, United States Judge, Eastern District of Wisconsin, signed an Order authorizing the continued interception of wire and electronic communications over Target Telephone #4 and the initial interception of wire communications over the cellular telephone number (224) 436-4768, Target Telephone #6, used by Miguel RODRIGUEZ.  During the court-authorized monitoring of these communications between May 31, 2017 and June 29, 2017 more than 205 intercepted telephone calls and text messages to and from Target Telephone #4 were deemed pertinent and criminal in nature. During the court-authorized monitoring of these communications in the same time-frame more than 132

8

intercepted telephone calls and text messages to and from Target Telephone #6 were deemed pertinent and criminal in nature. The interception authorized by the Order as to Target Telephones #4 and #6 ended on June 29, 2017 with the implementation of the Order detailed in the following paragraph.

24. On July 7, 2017, the Honorable J.P. Stadtmueller, United States Judge, Eastern District of Wisconsin, signed an Order authorizing the initial interception of wire and electronic communications over the cellular telephone number (414) 477-7044, Target Telephone #8, used by Clifton MORRISON, the initial interception of wire and electronic communications over the cellular telephone number (773) 807-9193, Target Telephone #9, used by Jose RODRIGUEZ, the initial interception of wire and electronic communications over the cellular telephone number (224) 542-9999, Target Telephone #10, used by Jose RODRIGUEZ, and the initial interception of wire and electronic communications over the cellular telephone number (414) 366-6537, Target Telephone #11, used by Clifton MORRISON. During the court-authorized monitoring of these communications between July 7, 2017 and August 4, 2017, more than 392 intercepted telephone calls and text messages to and from Target Telephone #8 were deemed pertinent and criminal in nature; more than 176 intercepted telephone calls and text messages to and from Target Telephone #9 were deemed pertinent and criminal in nature; more than 186 intercepted telephone calls and text messages to and from Target Telephone #10 were deemed pertinent and criminal in nature; and, more than 280 intercepted telephone calls and text messages to and from Target Telephone #11 were deemed pertinent and criminal in nature. The interception authorized by the Order as to Target Telephones #8, #9, #10, and #11 ended on August 5, 2017 with the implementation of the Order detailed in the following paragraph.

9

25.     On August 4, 2017, the Honorable Pamela Pepper, United States Judge, Eastern District of Wisconsin, signed an Order authorizing the continued interception of Target Telephones #8, #9, #10, and #11.  During the court-authorized monitoring of these communications between August 5, 2017 and September 1, 2017, more than 312 intercepted telephone calls and text messages to and from Target Telephone #8 were deemed pertinent and criminal in nature; more than 87 intercepted telephone calls and text messages to and from Target Telephone #9 were deemed pertinent and criminal in nature;  more than 220 intercepted telephone calls and text messages to and from Target Telephone #10 were deemed pertinent and criminal in nature; and, more than 131 intercepted telephone calls and text messages to and from Target Telephone #11 were deemed pertinent and criminal in nature.  The interception authorized by the Order as to Target Telephones #8, #9, #10 and #11 ended on September 2, 2017 with the implementation of the Order detailed in the following paragraph.

26.     On September 1, 2017, the Honorable J.P. Stadtmueller, Eastern District of Wisconsin, signed an Order authorizing the continued interception of Target Telephones #8, #9, and #10, and the initial interception of wire and electronic communications over the cellular telephone number (502) 794-6638, Target Telephone #15, used by Clifton MORRISON.  During the court-authorized monitoring of these communications between September 1, 2017 and September 30, 2017, more than 379 intercepted telephone calls and text messages to and from Target Telephone #8 were deemed pertinent and criminal in nature; more than 121 intercepted telephone calls and text messages to and from Target Telephone #9 were deemed pertinent and criminal in nature; more than 255 intercepted telephone calls and text messages to and from Target Telephone #10 were deemed pertinent and criminal in nature; and, more than 76 intercepted telephone calls and text messages to and from Target Telephone #15 were deemed pertinent and

criminal in nature. The interception authorized by the Order as to Target Telephones #8, #9, #10, and #15 ended on September 30, 2017 with the implementation of the Order detailed in the following paragraph.

27.     On October 26, 2017, the Honorable J.P. Stadtmueller, Eastern District of Wisconsin, signed an Order authorizing the interception of Target Telephones #8, #9, and #10, and the initial interception of wire and electronic communications over the cellular telephone number (414) 745-8110, Target Telephone #18, used by Clifton MORRISON.  During the court-authorized monitoring of these communications between October 26, 2017 and November 27, 2017, more than 399 intercepted telephone calls and text messages to and from Target Telephone #8 were deemed pertinent and criminal in nature; more than 212 intercepted telephone calls and text messages to and from Target Telephone #9 were deemed pertinent and criminal in nature; more than 478 intercepted telephone calls and text messages to and from Target Telephone #10 were deemed pertinent and criminal in nature; more than 322 intercepted telephone calls and text messages to and from Target Telephone #18 were deemed pertinent and criminal in nature.  The Order as to Target Telephones #8, #9, #10, and #18 ended on November 24, 2017 with the implementation of the Order detailed in the following paragraph.

28.     On November 22, 2017, the Honorable Lynn Adelman, Eastern District of Wisconsin, signed an Order authorizing the interception of wire communications for Target Telephone #8, and the wire and electronic communications for Target Telephones #9, #10, and #18.  These interceptions established, in part, that Pedro **MONARREZ JR.**, and others trafficked in controlled substances.

**C.** **Clifton MORRISON was supplied narcotics by Jose RODRIGUEZ and Miguel RODRIGUEZ. In turn, Jose RODRIGUEZ was supplied narcotics, in part, by Pedro MONARREZ JR. whose organization often utilized Luis NEVAREZ as a courier.**

29.     In the aftermath of the arrests and indictment of the seventeen individuals, case agents conducted proffered debriefs of Clifton MORRISON. In part, MORRISON indicated that he received cocaine and heroin from Jose RODRIGUEZ on consignment during the course of the conspiracy. MORRISON indicated that beginning in approximately 2011 MORRISON received kilogram quantities of cocaine from Jose RODRIGUEZ. MORRISON further stated that in 2013 MORRISON began to receive kilogram quantities of heroin from Jose RODRIGUEZ. MORRISON also indicated that he was able to return unsuitable heroin to Jose RODRIGUEZ. DTO members often used the code word "truck" to refer to heroin.

30.     As an example, on July 7, 2017, at 9:49 p.m., Jose RODRIGUEZ called MORRISON and asked, "And how is the truck running?" MORRISON replied, "Yeah, I think I'm gonna wrap it up… I really think they took that thing all the way to the chop shop." Jose RODRIGUEZ said, "This guy, you know, they go by word of mouth, and it just doesn't work out that way, you know what I mean? So go ahead, and just do it. Just wrap it up, fuck it." MORRISON advised he had "a portion of it already in rotation. The part that I still got wrapped I'll just wrap that part up." Jose RODRIGUEZ stated, "That last truck you got, that might be another week or so… But okay, just wrap that up buddy, okay? And fuck it, you know, let them learn a lesson." Based on upon their training, experience, and familiarity with the investigation, case agents believed MORRISON advised that the heroin MORRISON most recently obtained from Jose RODRIGUEZ was of poor quality. MORRISON already distributed some of it ("in rotation") but wanted to return the remainder of it to Jose RODRIGUEZ. Jose RODRIGUEZ

acknowledged, and told MORRISON that the type of heroin MORRISON received prior to the bad heroin would possibly be available in another week.

31. In this regard, on July 8, 2017, at 8:24 a.m., Jose RODRIGUEZ sent a text message to **MONARREZ JR.** who was using phone number (312) 273-3413.[2] The text read, "Looks like the truck is coming back, very bad motor! All Else very good, can go again to auction for more cars!" At 2:55 p.m., Jose RODRIGUEZ received a text message from **MONARREZ JR.** that read, "Let me know when ready." At 9:48 p.m., Jose RODRIGUEZ sent a text message to **MONARREZ JR.** that read, "By thur."

32. As stated previously, "truck" is coded language used to refer to heroin. Therefore, case agents believe Jose RODRIGUEZ informed **MONARREZ JR.** that he would be returning an undetermined amount of heroin due to its poor quality ("Looks like the truck is coming back,

---

2 Initially, law enforcement believed that Samuel FLORES-MORALES, and not **MONARREZ JR.**, used telephone number (312) 273-3413. While intercepting communications on or about August 18, 2017, in which the user of (312) 273-3413 and RODRIGUEZ set up a meeting at 7546 W. Addison Street, law enforcement surveillance observed a black Lincoln MKZ arrive at 7546 W. Addison which at the time of the meeting was registered to the wife of FLORES-MORALES. Law enforcement observed photographs of "Sam Flores" on "Melissa Flores'" Facebook.com account, and the individual depicted in those photographs visually matched an Arkansas Department of Transportation photograph of Samuel FLORES-MORALES. Law enforcement database records indicated that FLORES-MORALES resided at the same address listed for Melissa Flores on the vehicle registration. At this August 18, 2017, meeting agents were able to obtain a partial photograph of the individual entering the storefront at 7546 W. Addison Street. In height, weight and hair color MORALES-FLORES matched the specifics of the person entering the storefront. Subsequently, case agents determined that **Pedro MONARREZ JR.** and MORALES-FLORES are of similar height, weight, and hair color. Case agents further determined, as set forth below, **Pedro MONNAREZ JR.** entered the storefront, and was the user of (312) 273-3413, and later (773) 397-5623.

When the user of (312) 273-3413, **Pedro MONARREZ JR.**, changed phone numbers to (773) 397-5623, law enforcement determined the same person used the new telephone number based on telephone toll analysis and voice recognition conducted by trained linguists. The subscribers listed on both phones were "Info Update," and "Prepaid Customer," respectively.

very bad motor!"). In addition, case agents believe Jose RODRIGUEZ informed **MONARREZ JR.,** that he would return the narcotics by Thursday, July 13, 2017 ("by thur.").

33.     On July 11, 2017, at 4:41 p.m., **MONARREZ JR.** sent Jose RODRIGUEZ a text message that read, "Ready for auction this weekend?" At 4:44 p.m., Jose RODRIGUEZ sent a text message to **MONARREZ JR.** that read, "Ok." Case agents believe **MONARREZ JR.** wanted to confirm that Jose RODRIGUEZ was able to meet the following Thursday, and Jose RODRIGUEZ acknowledged he would be able to meet.

34.     On July 13, 2017, at 11:30 a.m., **MONARREZ JR.** sent Jose RODRIGUEZ a text message asking, "Ready?" At 11:34 a.m., Jose RODRIGUEZ replied via text message, "Little over half way need till weekend." At 11:52 a.m., **MONARREZ JR.** replied via text message, "Secretary coming to dmv will pick up whatever paperwork available today. and whenever u are ready thi[s] weekend will pick up and drop off plates." At 11:55 a.m., Jose RODRIGUEZ replied via text message, "Ok."

35.     At 12:10 p.m., Luis NEVAREZ called Jose RODRIGUEZ at Target Telephone #9 using (224) 478-8161. During this call, NEVAREZ identified himself as "Junior" and asked when Jose RODRIGUEZ "had time." Jose RODRIGUEZ replied, "So it would be good around 4:00… Do you remember my house?" NEVAREZ replied, "Your house? Yes." Jose RODRIGUEZ stated, "Yes, better in my house. That way we are more relaxed." NEVAREZ acknowledged.

36.     At 12:29 p.m., **MONARREZ JR.** sent Jose RODRIGUEZ a text message that read, "Bidding number at last auction was 52." At 2:13 p.m., Jose RODRIGUEZ replied via text message, "40." Based upon their training, experience, and familiarity with the investigation, case agents believe **MONARREZ JR.** asked if Jose RODRIGUEZ had drug-related proceeds Jose RODRIGUEZ owed to **MONARREZ JR.,** but Jose RODRIGUEZ advised that he only had a little

14

more than half of what he owed to **MONARREZ JR.** Jose RODRIGUEZ indicated that he would have the full amount by the weekend. **MONARREZ JR.** stated that **MONARREZ JR.**'s courier would retrieve whatever drug-related proceeds Jose RODRIGUEZ possessed, and that Jose RODRIGUEZ would be supplied additional narcotics over the weekend ("will pick up whatever paperwork available today. and whenever u are ready thi[s] weekend will pick up and drop off plates."). In addition, case agents believe **MONARREZ JR.** informed Jose RODRIGUEZ that the price of a kilogram of heroin was currently $52,000 ("Bidding number at last auction was 52"), and Jose RODRIGUEZ indicated he currently possessed $40,000 in drug-related proceeds ("40").

37.     At 3:00 p.m., Jose RODRIGUEZ sent a text message to **MONARREZ JR.** that read, "Is he picking up the truck as well?" Based upon their training, experience, and familiarity with the investigation, case agents believe Jose RODRIGUEZ inquired whether **MONARREZ JR.'s** courier would also take the poor-quality narcotics Jose RODRIGUEZ wanted to return to **MONARREZ JR.** as well ("Is he picking up the truck as well?").

38.     At 4:02 p.m., NEVAREZ called Jose RODRIGUEZ and advised he was at Jose RODRIGUEZ's residence, which case agents to know to be 4269 Ruby Street, Schiller Park, IL. Case agents observed NEVAREZ arrive in a red Dodge Ram, bearing Illinois registration 2258081B.

39.     At 6:22 p.m., **MONARREZ JR.** sent a text message to Jose RODRIGUEZ that read, "Ok, yes lets have him take it when u see him again." Case agents believe **MONARREZ JR.** affirmed that the courier would pick up the bad narcotics.

40.     On July 24, 2017, at 1:05 p.m., MORRISON called Jose RODRIGUEZ and said, "Just checking out, about to grab a bite to eat right here, grab a little lunch." RODRIGUEZ replied, "Okay, are you still in town?" MORRISON replied, "Yeah." RODRIGUEZ responded, "Okay,

15

'cause I'm gonna pick up a friend of mine at the hospitals. He was having himself checked out and I'm doing that now, you know what I mean." MORRISON stated, "You coming back in the area, I'mma go to the mall, right around. So I just wait for you around this area." RODRIGUEZ replied, "Okay, you go ahead. Yeah, I'll get him dropped off, and, uh, and then you can go ahead and you know I mean. And we'll meet you at…where that area is, okay?" MORRISON replied, "Okay." Case agents knew from previously intercepted communications that MORRISON was in the Chicago area for a concert. Case agents believe MORRISON and Jose RODRIGUEZ intended to meet with each other later that day in the area of "the mall." Case agents know the Fashion Outlets of Chicago are located approximately three miles north of RODRIGUEZ's residence of 4269 Ruby Street, Schiller Park, IL.

41.     At 2:14 p.m., Jose RODRIGUEZ sent a text message to MORRISON that read, "In 20." Case agents interpreted this to mean Jose RODRIGUEZ would be meeting MORRISON in twenty (20) minutes. Case agents traveled to the area of Jose RODRIGUEZ's residence.

42.     At 2:24 p.m., MORRISON received a call from Jose RODRIGUEZ. Due to technical difficulties, the conversation was not recorded from the beginning, but was recorded mid-sentence. At the time the recording began case agents heard MORRISON say, "Yeah I'm here. I'm picking up my bet and then I…leave out of here if you don't wanna come in here." Jose RODRIGUEZ stated, "Okay well, then you wanna, for you by there, by me or…" Case agents believe MORRISON and Jose RODRIGUEZ were trying to determine a location to meet. It was between MORRISON's location near the mall or Jose RODRIGUEZ's house ("by me"). MORRISON stated, "Oh, say it again." Jose RODRIGUEZ responded, "'Cause there's really no parking around there, by there, unless you go into the parking. So I meet you there, by the gaming, [U/I] you I mean." MORRISON replied, "Right, Right." Jose RODRIGUEZ continued, "Okay,

16

I'll park by where we always kind of park." MORRISON asked, "Okay, how long you say?" Jose RODRIGUEZ replied, "I'm here now." MORRISON stated, "Oh you there now, okay." MORRISON continued, "I'll leave out of here, in like 15 minutes, in just…" Case agents believe Jose RODRIGUEZ was already at a location where he was going to meet with MORRISON. Based upon earlier intercepted communications, case agents believe Jose RODRIGUEZ was located at the Rivers Casino, 3000 S. River Road, Des Plaines, Illinois 60018. This location is just north of the mall consistent with the electronic location data from MORRISON's phone.

43.     At 2:37 p.m., MORRISON received a call from Jose RODRIGUEZ using his other telephone. Jose RODRIGUEZ said, "Hey buddy, I'm calling you from this number because the other phone just died out, okay?" MORRISON stated, "Oh it did, okay." RODRIGUEZ responded, "I didn't bring a power charger so I just gotta call you from this, to let you know I'm here. Okay, yeah." MORRISON said, "Okay, well I'm just waiting for…" RODRIGUEZ interrupted, "Not a problem. I'll be over here waiting for you. I'm in the parking ah, I'm in C2, okay?" MORRISON responded, "Okay." Case agents believe the physical device used to communicate over Target Telephone #9 lost battery power and Jose RODRIGUEZ did not have a phone charger. For this reason, Jose RODRIGUEZ used Target Telephone #10 to contact MORRISON so they would be able to meet with each other. Additionally, Jose RODRIGUEZ told MORRISON he was parked in parking area C2 at the Rivers Casino.

44.     Case agents pulled into the parking lot of the Rivers Casino at 3:01 p.m. and observed the gray Mercedes Benz SUV bearing Wisconsin registration IA77 enter the parking lot and park. Case agents identified MORRISON operating the vehicle during prior surveillance operations. At 3:02 p.m., MORRISON called Jose RODRIGUEZ. Jose RODRIGUEZ answered,

"I'm here in the black… I'm here in the black Hyundai. It's a Genesis." MORRISON responded,

"Oh the Genesis." RODRIGUEZ stated, "It's right in front of you. Yeah, the black Genesis."

45. Case agents observed MORRISON park his vehicle and at approximately 3:04 p.m., MORRISON entered the passenger seat of Jose RODRIGUEZ's vehicle. Case agents observed that MORRISON was alone. MORRISON remained in the front passenger seat of Jose RODRIGUEZ's vehicle until 3:24 p.m. at which time MORRISON exited the vehicle and walked back to his car. Case agents observed Jose RODRIGUEZ's Hyundai Genesis bearing Illinois registration 8217. A check of the Illinois Department of Transportation database revealed the vehicle is registered to Hyundai Lease Titling.

46. After the meeting, both Jose RODRIGUEZ and MORRISON left the area. MORRISON returned to the area of the Rosemount Outlet Malls. At 3:24 p.m., MORRISON, called another DTO member, Tommie STEVENS, at (262) 408-7343. MORRISON told STEVENS about MORRISON's discussion with RODRIGUEZ. STEVENS said, "Waiting on you, [U/I] move." MORRISON replied, "Yeah, I know. This situation that I'm gonna explain to you, you know this shit is complicated right now so… He's leaving out of town Friday, so you gotta line something up for tomorrow because I gotta help him. I don't know why dude keep holding this shit." Case agents believe MORRISON told STEVENS that Jose RODRIGUEZ was leaving to go out of town on Friday ("He's leaving out of town Friday."). MORRISON further told STEVENS that Jose RODRIGUEZ was going to give MORRISON additional narcotics, which Jose RODRIGUEZ had been holding onto, and that MORRISON wanted STEVENS to line up customers to assist in purchasing the narcotics Jose RODRIGUEZ was going to give him ("so you gotta line something up for tomorrow because I gotta help him. I don't know why dude keep holding this shit."). MORRISON continued, "Yeah, he keeps holding on to it. I thought he was

18

empty, so he still gotta a piece." Case agents believe MORRISON learned Jose RODRIGUEZ possessed additional narcotics that were previously unknown to MORRISON.

47. MORRISON continued to tell STEVENS about his discussion with Jose RODRIGUEZ, "Yeah. He was going to leave out of town and hold onto that cuz he said, 'Man, we're not gonna do that until I get back into town.' I said 'What,' and he said 'I'm leaving Friday. I'll be back in seven days,' and I'm like 'Dog, that's two weeks.'" Case agents believe MORRISON learned Jose RODRIGUEZ was going to be out of town for seven days, and MORRISON would be unable to acquire narcotics for approximately two weeks.

48. MORRISON continued, "So he said...I said, 'Man I got people waiting with change, C.O.D.' So he said, 'alright check this out. I'm gonna give you this piece.' I'm said 'you still holding?' Like dude, what the fuck?" Case agents believe MORRISON was surprised to learn RODRIGUEZ had additional narcotics that had not been previously offered to MORRISON by RODRIGUEZ for purchase.

49. MORRISON continued his conversation with STEVENS, "So he like 'naw. I was just gon' chop that down.' So you know what? He's been getting quite a few and he just holding, holding them tight right now, but I'm glad I paid him to the zero so he don't got shit to say, that's why he came out with the other one, cuz he thought... If I would have been two to three short, he would have never said nothing about that other one." STEVENS replied, "Right, woo, I'm glad I came through with that shit." MORRISON said, "Yeah, yeah, we played that one just right; like scrape up everything and let's just get... I get mine back off on the back end so yeah, but now he wants... he was like 'can you dump that and bring me the change the next day?' 'Cuz I told him I have people waiting, so whoever you got waiting, just do what you have to do. I have somebody waiting for real." Case agents believe MORRISON and STEVENS discussed a recent payment

19

MORRISON made to Jose RODRIGUEZ for narcotics that zeroed out his balance ("I'm glad I paid him to the zero") after which MORRISON no longer had any drug debt to Jose RODRIGUEZ. MORRISON believed that had he still owed Jose RODRIGUEZ money for a narcotics debt, Jose RODRIGUEZ would not have offered the additional narcotics he was holding. MORRISON further said Jose RODRIGUEZ wanted MORRISON to sell the narcotics as quickly as possible and return the drug-related proceeds to Jose RODRIGUEZ before Jose RODRIGUEZ left town Friday.

50.     At 5:10 p.m., MORRISON, using Target Telephone #11, called Jose RODRIGUEZ at Target Telephone #10. MORRISON asked, "Is this uh… you want me to call you on the other one? Or is this one good?" Case agents believe MORRISON asked Jose RODRIGUEZ if MORRISON should contact him on Jose RODRIGUEZ's other telephone phone. Jose RODRIGUEZ said, "Yeah, you can call me on the other one." Immediately thereafter MORRISON, using Target Telephone #11, called Jose RODRIGUEZ at Target Telephone #9. Jose RODRIGUEZ asked, "What's going on pal?" MORRISON said, "Yeah uh… I'm still hanging around here, I didn't leave. I didn't try to beat that traffic or whatever so…" RODRIGUEZ replied, "Oh, okay." MORRISON continued, "If you uh… I'm still in the area if you want me to… You want to do that today?" Case agents believe MORRISON asked Jose RODRIGUEZ if they wanted to meet again so Jose RODRIGUEZ could provide MORRISON an undetermined quantity of narcotics. RODRIGUEZ said, "Yeah, you know what? Are you going to wait until the traffic dies down?" MORRISON replied, "Yup." RODRIGUEZ stated, "Okay, well then uh… What time is it?" MORRISON answered, "Uh, it is ten after five." RODRIGUEZ said, "Five. So I can probably see you around 6:30 or 7:00; that will be the earliest." MORRISON replied, "That's cool, I'll hang around here 'til then." Case agents believe MORRISON told Jose

RODRIGUEZ he would wait in the area of the Rosemont Mall until Jose RODRIGUEZ had acquired the undetermined amount of narcotics he was going to provide to MORRISON.

51.     Case agents re-established positions of surveillance in the area of the Rivers Casino. At 6:25 p.m., MORRISON, at Target Telephone #11, received a call from Jose RODRIGUEZ using Target Telephone #9. RODRIGUEZ said, "Hey buddy, I'm on my way now, so figure 20-25 minutes at the most." MORRISON asked, "About 25 minutes?" RODRIGUEZ replied, "Yeah, so meet me where we met before, okay?" MORRISON answered, "Same? Okay." RODRIGUEZ stated, "Right around the same place, alright." MORRISON agreed.  Case agents believe Jose RODRIGUEZ advised he would meet MORRISON in the area of the Rivers Casino in approximately 20 minutes.

52.     At 6:38 p.m., MORRISON, on Target Telephone #11, received a call Jose RODRIGUEZ using Target Telephone #9. Jose RODRIGUEZ stated, "Hey buddy, I thought it was bad traffic at this time but I'm right here around the corner." MORRISON responded, "Okay, well I'm five minutes." RODRIGUEZ stated, "Oh, okay. Well, you're five minutes. Okay I'll be there. Hey, I'm in that Volvo wagon, gold Volvo wagon." MORRISON responded, "Gotcha." Case agents believe Jose RODRIGUEZ notified MORRISON he would meet MORRISON sooner than he originally planned because traffic was not as bad as he thought. MORRISON told Jose RODRIGUEZ he would be another five minutes to get to the Rivers Casino. Jose RODRIGUEZ advised he was driving a gold Volvo station wagon. Case agents had previously observed that vehicle parked in the driveway at 4269 Ruby Street earlier in the evening.

53.     At 6:51 p.m., case agents observed MORRISON enter the parking lot of the Rivers Casino and park in the same area in which he previously parked when he met with Jose RODRIGUEZ. At the same time, MORRISON, on Target Telephone #11, received a call from

Jose RODRIGUEZ using Target Telephone #9. Jose RODRIGUEZ said, "Yeah, I'm right in front of you buddy." MORRISON asked, "You in front of me?" Jose RODRIGUEZ replied, "Yeah, two rows, c'mon and walk." MORRISON stated, "Okay, okay, alright I see you." Jose RODRIGUEZ directed, "Straight in front."

54. Case agents observed MORRISON exit the vehicle he was driving and enter the front passenger seat of Jose RODRIGUEZ's gold Volvo station wagon. MORRISON remained in the vehicle with Jose RODRIGUEZ for a short time. Case agents observed MORRISON exit the vehicle carrying a plastic shopping bag, inside of which case agents observed a rectangular shape. Based upon their training and experience, case agents believe the shape and size of the item inside the plastic bag to be consistent with the shape of a kilogram of a controlled substance. MORRISON returned to his vehicle. Both MORRISON and Jose RODRIGUEZ departed the parking lot.

55. Case agents continued to monitor the electronic location information from MORRISON's phone and learned he traveled back to the Milwaukee area. At approximately 11:25 p.m., case agents observed the vehicle MORRISON was operating parked in the driveway of the residence.

56. On July 28, 2017, at 4:15 p.m., Jose RODRIGUEZ, using Target Telephone #9, received a text message from **MONARREZ JR.** using (312) 273-3413. According to location data, on July 28, 2017, at 1:26 p.m., this phone was located in El Paso, Texas. The text message was in Spanish and translated by a trained Spanish-speaking linguist. The text message read, "How are you?" As stated previously, case agents believe **MONARREZ JR.** was a source of supply to Jose RODRIGUEZ. Therefore, case agents believe **MONARREZ JR.** was asking if Jose RODRIGUEZ needed any additional narcotics. On July 29, 2017, at 7:49 p.m., Jose RODRIGUEZ

22

sent a text message to **MONARREZ JR.** that read, "Good for now call you in 10 days." From previously intercepted communications, case agents know Jose RODRIGUEZ planned to leave for Puerto Rico on July 28, 2017, staying for approximately ten days. Therefore, case agents believe Jose RODRIGUEZ's text message advised a source of his supply that Jose RODRIGUEZ did not need any additional narcotics from **MONARREZ JR.** at that time.

57.    On August 10, 2017, at 7:56 p.m., Jose RODRIGUEZ, on Target Telephone #9, received a text message from **MONARREZ JR.** using (312) 273-3413. This text message read, "How u doing?" On August 11, 2017, at 8:14 a.m., Jose RODRIGUEZ, using Target Telephone #9, sent a text message to **MONARREZ JR.** at (312) 273-3413 that read, "Just got back, getting things ready. Give me a day or two!" At 8:47 a.m., Jose RODRIGUEZ, on Target Telephone #10, received an incoming text from **MONARREZ JR.** using (312) 273-3413. The text message read, "Ok."

58.    Case agents believe Jose RODRIGUEZ had just returned from Puerto Rico and needed time to gather drug related proceeds together before they could meet ("Just got back, getting things ready. Give me a day or two.").

59.    On August 15, 2017, at 9:08 a.m., Jose RODRIGUEZ, on Target Telephone #9, received a call from **MONARREZ JR.** using (312) 273-3413. Location data received for this phone revealed that on August 15, 2017, at 8:08 a.m., the phone was located in El Paso, Texas. **MONARREZ JR.** asked, "Hey buddy how are we doing?" Jose RODRIGUEZ replied, "Hey buddy we doing good. Listen... uh yeah, I'm trying to wrap up the next couple...it's just had a couple of slow pokes. When I got back you know I mean? So uh... we're, uh, but the truck is ready to go. And I...I'll have a nice set of chunk. Give me next... what's today? Tuesday? Like Thursday, okay, buddy? And are you gonna send the same guy?" **MONARREZ JR.**

23

acknowledged and RODRIGUEZ asked, "Uh, it's Junior Doredo [PH], or no?" **MONARREZ JR.** replied, "Uh, you know what, yeah, yeah, I think he's back now. So he may yeah..." Jose RODRIGUEZ stated, "'Cause he can do that pick up on that truck, whenever he wants, you know what I mean?" **MONARREZ JR.** stated, Okay, sounds good." Jose RODRIGUEZ continued, "And then uh the other... then I'll see him or the other guy, you know. Probably at the same time, if you want me to do that." **MONARREZ JR.** replied, "Yeah, let's do it separate, so..." Jose RODRIGUEZ stated, "Okay, that's what I thought. Okay, buddy. Let me wrap it up. I just, you know, I was away for a couple of weeks, you know, on emergency and I kind of left [U/I]. But I had to pick up a couple of guys that were slacking, you know I mean?" Again, **MONARREZ JR.** agreed. RODRIGUEZ stated, "So I'm gonna... but I should have it wrapped up, give me a couple more days buddy, it's looking better, okay?" **MONARREZ JR.** acknowledged.

60.     Based upon their training, experience, and familiarity with the investigation, case agents believe Jose RODRIGUEZ informed his source of supply, **MONARREZ JR.**, that he was still collecting drug-related proceeds and that he had bad narcotics, heroin, to return to **MONARREZ JR.** ("the truck is ready to go. And I... I'll have a nice set of chunk."). Jose RODRIGUEZ confirmed "Junior" would pick up the bad narcotics from him ("And are you gonna send the same guy? Uh, it's Junior Doredo [PH], or no?").

61.     On August 17, 2017, at 5:43 p.m., **MONARREZ JR.** sent a text to Jose RODRIGUEZ that read, "You got time for me? Im near by." At 5:45 p.m., **MONARREZ JR.** called Jose RODRIGUEZ. Jose RODRIGUEZ asked, "Hey, are you here in the city?" **MONARREZ JR.** advised he was, and Jose RODRIGUEZ suggested they meet the following day. Location data for (312) 273-3414 revealed that on August 17, 2017, at 5:45 p.m., this phone was located in Chicago, Illinois.

62. At 8:30 p.m., MORRISON called Jose RODRIGUEZ. MORRISON asked for additional narcotics. Jose RODRIGUEZ advised, "I don't have it right now, Rue... I just got a little piece." Jose RODRIGUEZ continued, "Well, I'm gonna see ol' boy tomorrow. I have to wait, and I'm finna see what he'll do." Case agents believe MORRISON asked to purchase a quantity of narcotics, but Jose RODRIGUEZ did not have the entire amount requested by MORRISON. Jose RODRIGUEZ said he was going to see his source of supply, **MONARREZ JR.,** the following day and would ask to obtain additional narcotics for MORRISON.

63. On August 18, 2017, at 10:43 a.m., NEVAREZ called Jose RODRIGUEZ. NEVAREZ stated, "I can go there in a little bit, later on. What do you think?" Jose RODRIGUEZ suggested he call NEVAREZ later because Jose RODRIGUEZ's son was in town, and because Jose RODRIGUEZ had to "make a few trips to pick up one or two checks." When asked what time Jose RODRIGUEZ advised, "I think that about 4:00, sir."

64. At 11:57 a.m., Jose RODRIGUEZ sent a text message to MORRISON that read, "Can you get that check from friend?" Based upon their training, experience, and familiarity with the investigation, case agents believe Jose RODRIGUEZ asked MORRISON for drug-related proceeds so Jose RODRIGUEZ could repay his source(s) of narcotics supply.

65. At 1:48 p.m., MORRISON called Jose RODRIGUEZ. MORRISON stated, "Well I'm trying to do something else around here. So hopefully, uh, I gotta see a couple people, maybe I can make something happen, uh, get close to it. Jose RODRIGUEZ replied, "Okay, well try to make that happen later today, you know. If not, tomorrow early, you know what I mean? So we can, you know... Because I'm in talks with somebody, about, you know, trying to do something... But I do have to have 'cause I have, you know, these guys, they're in town and I have to, you, give them a check." Case agents believe Jose RODRIGUEZ advised that he needed drug-related

25

proceeds from MORRISON so Jose RODRIGUEZ could pay off his debt to **MONARREZ JR.** before receiving more narcotics.

66.     At 4:17 p.m., **MONARREZ JR.**, using (312) 273-3413, called Jose RODRIGUEZ at (773) 807-9193. Location data for (312) 273-3413 revealed that on August 18, 2017, at 4:17 p.m., this phone was located in Chicago, Illinois. Jose RODRIGUEZ said, I'm finishing up a couple of little things here, okay? So I told him to give me a little… I told him to around 4:00 but I just got a couple of little more things to do. Why don't you tell him that I can see him around 6 o'clock, okay?" **MONARREZ JR.** acknowledged. Jose RODRIGUEZ stated, "And he knows where to go, not a problem, okay? And then you, you wanna sit down with me or something?" **MONARREZ JR.** replied, "Yeah, yeah, so we can just…just kind of…balance it all out." From previously-intercepted communications, case agents believe Jose RODRIGUEZ advised **MONARREZ JR.** that Jose RODRIGUEZ initially told NEVAREZ to meet at Jose RODRIGUEZ's residence at 4:00 p.m. but now requested to have NEVAREZ meet at Jose RODRIGUEZ's residence at 6:00 p.m. This additional time would allow Jose RODRIGUEZ time to gather more drug-related proceeds to turn over to NEVAREZ for **MONARREZ JR.** **MONARREZ JR.** acknowledged and then requested to meet with Jose RODRIGUEZ later to further discuss Jose RODRIGUEZ's remaining drug debt with **MONARREZ JR.**

67.     At 5:59 p.m., NEVAREZ sent a text message to Jose RODRIGUEZ in Spanish that translated to, "Outside." Case agents again observed NEVAREZ arrive at Jose RODRIGUEZ's residence, 4269 Ruby Street, Schiller Park, IL, in NEVAREZ's red Dodge Ram. NEVAREZ pulled into Jose RODRIGUEZ's driveway that was out of the view of surveillance units. Case agents were eventually able to see Jose RODRIGUEZ speaking with NEVAREZ through NEVAREZ's front driver's side window. A short time later, NEVAREZ left, and case agents were

26

able to follow him until he parked in front of 1806 N. 18th Avenue, Melrose Park, Illinois. NEVAREZ exited his truck, removed a large black duffel bag from the rear driver's seat, and a green and white cooler from the rear passenger seat. NEVAREZ carried the bag and cooler and walked into the south-facing door for 1806 N. 18th Avenue, Melrose Park, Illinois.

68.     At 6:46 p.m., Jose RODRIGUEZ, using (773) 807-9193, sent text messages to **MONARREZ JR.** at (312) 273-3413 advising him to meet Jose RODRIGUEZ at 7546 W. Addison Street, Melrose Park, Illinois. At 7:31 p.m., **MONARREZ JR.** called to advise Jose RODRIGUEZ that he was there. Location data for (312) 273-3413 revealed that on August 18, 2017, at 7:31 p.m., the phone was located in Chicago, Illinois. At that time, case agents observed a black Lincoln bearing Iowa registration EXN-403[3] arrive and park directly in front of 7546 W. Addison Street. As Jose RODRIGUEZ opened the door to 7546 W. Addison Street, **MONARREZ JR.** exited the Lincoln, and entered the storefront with Jose RODRIGUEZ. After approximately 20 minutes, **MONARREZ JR.** exited the storefront, entered the Lincoln, and departed the area. As stated previously, case agents believe Jose RODRIGUEZ met with **MONARREZ JR.** to discuss Jose RODRIGUEZ's remaining drug debts with **MONARREZ JR.**

69.     On August 30, 2017, at 8:12 p.m., **MONARREZ JR.**, using (773) 397-5623, called Jose RODRIGUEZ at (773) 807-9193.[4] RODRIGUEZ said, "I'm trying to...you know. It's because it's a bit slow, but in a few days I will have something good for you. It's because the guy

---

3 A review of Iowa Department of Transportation records revealed this vehicle listed to Melissa Flores in Burlington, IA. Through investigation, case agents learned that Melissa Flores was married to Samuel FLORES-MORALES. In addition, case agents learned that Samuel FLORES-MORALES's sister, Lorena Flores, is married to **Pedro MONARREZ JR.**, thus they are brothers-in-law.

4 On August 22, 2017, Jose RODRIGUEZ received a text message from (773) 397-5623 which read, "New one." On August 30, 2017, at 12:42 p.m. and 8:12 p.m., location data for this phone revealed that it was located in El Paso, Texas.

from up north has me backed up, the same guy who has that…understand me?" Jose RODRIGUEZ continued, "I have a few bucks for you, but give me a few more days to see if I have at least have 30-40 dollars, okay? He had a small accident, but it's nothing serious. He owes me a few bucks so he's going to get a loan in a few weeks because he has a property. He's going to give me some money that he owes me from there, okay?"

70.     Based upon their training, experience, and familiarity with the investigation, case agents believe Jose RODRIGUEZ advised **MONARREZ JR.** that Jose RODRIGUEZ was waiting for drug-related proceeds from MORRISON ("…the guy from up north has me backed up). Jose RODRIGUEZ advised he had some money for **MONARREZ JR.** but asked for a few more days so Jose RODRIGUEZ could possibly have $30,000 to $40,000 in drug-related proceeds ("I have a few bucks for you but give me a few more days to see if I at least have 30-40 dollars, okay?"). Jose RODRIGUEZ indicated that MORRISON would be getting money from a loan soon and that MORRISON would provide some of that money to Jose RODRIGUEZ who would subsequently turn it over to **MONARREZ JR.**

71.     In addition, on September 2, 2017, at 10:19 a.m., **MONARREZ JR.**, using (773) 397-5623, sent a text message to Jose RODRIGUEZ at (773) 807-9193 that, translated into English, read, "Good morning sir, they are going to call you soon. How are you." At 11:20 a.m., Jose RODRIGUEZ replied via text message that translated into English, read, "I have a check for 12 for today." Case agents believe **MONARREZ JR.** indicated a courier would be calling Jose RODRIGUEZ soon to obtain drug-related proceeds owed to **MONARREZ JR.** ("they are going to call you soon."). Jose RODRIGUEZ advised he had $12,000 for **MONARREZ JR.** ("I have a check for 12 for today.").

28

72.     At 2:24 p.m., Jose RODRIGUEZ received a telephone call from NEVAREZ. Jose RODRIGUEZ asked if NEVAREZ was going to visit today and advised he would be at his house in about one hour. NEVAREZ stated he would call Jose RODRIGUEZ in approximately two or three hours. At 4:15 p.m., Jose RODRIGUEZ sent a text message to NEVAREZ that, translated into English, read, "Come." At 4:28 p.m., NEVAREZ replied via text message that translated into English, read, "I'm going." At 4:46 p.m., Jose RODRIGUEZ called NEVAREZ. NEVAREZ stated he would be outside of Jose RODRIGUEZ's residence soon. At 4:58 p.m., Jose RODRIGUEZ sent a text message to **MONARREZ JR.** at (773) 397-5623 that read, "15." Case agents believe NEVAREZ, a courier for **MONARREZ JR.** and/or his organization, met with Jose RODRIGUEZ to obtain drug-related proceeds owed to **MONARREZ JR.** Case agents also believe that after Jose RODRIGUEZ met with NEVAREZ, Jose RODRIGUEZ sent a text message advising **MONARREZ JR.** that Jose RODRIGUEZ turned over $15,000 in drug-related proceeds to NEVAREZ.[5]

73.     On September 7, 2017 at 6:11 p.m., MORRISON called Jose RODRIGUEZ and stated, "I'm at maybe 10…trying to get to 15." Jose RODRIGUEZ asked when MORRISON would have "15." MORRISON advised he had to "do one more little round up here tomorrow…see what it comes to." Jose RODRIGUEZ indicated he was "Trying to maneuver something. I'm waiting for somebody else to come from out of town;" and, "Right now, the other person I owe, I'm not gonna get nothing 'til I pay that debt off." Jose RODRIGUEZ told MORRISON to call Miguel RODRIGUEZ, Jose RODRIGUEZ's brother, to provide Miguel RODRIGUEZ with drug-related proceeds.

---

5 Location data for (773) 397-5623 revealed that on September 4, 2017, at 6:20 p.m., the phone was located in El Paso, Texas.

74.     Miguel RODRIGUEZ called MORRISON numerous times on September 8, 2017, but all the calls went unanswered.  On September 9, 2017, at 11:09 a.m., Miguel RODRIGUEZ called MORRISON again.   MORRISON and Miguel RODRIGUEZ agreed to meet in the afternoon; however, MORRISON later called Miguel RODRIGUEZ and asked to reschedule their meeting for the following day.  At 7:24 p.m., MORRISON, using Target Telephone #8, called DTO member Ricky CHRISTOPHER at (414) 914-1203.   MORRISON said he missed his "appointment," and that he wanted to "leave these receipts so somebody could take them, uh, to dude tomorrow."  CHRISTOPHER acknowledged.  MORRISON reminded CHRISTOPHER that CHRISTOPHER needed a vehicle with license plates – "or you could give them to the Cable guy or something."   CHRISTOPHER again indicated he would meet Miguel RODRIGUEZ.  CHRISTOPHER and MORRISON then agreed to meet before 9:00 p.m.  Based upon their training, experience, and familiarity with the investigation, case agents believe MORRISON informed CHRISTOPHER that MORRISON had not previously met with Miguel RODRIGUEZ and asked if CHRISTOPHER would be able to deliver the drug-related proceeds ("receipts") to Miguel RODRIGUEZ.  Case agents have observed another DTO member, Ronnie MCFADDEN, operating a truck bearing a Time Warner Cable placard and know MCFADDEN was an employee of Time Warner Cable.  Therefore, case agents believe that MORRISON told CHRISTOPHER that CHRISTOPHER could give the drug-related proceeds to MCFADDEN ("or you could give them to the Cable guy or something") if CHRISTOPHER was unable to meet with Miguel RODRIGUEZ.

75.     On September 10, 2017, at 10:43 a.m., MORRISON called Jose RODRIGUEZ.  MORRISON advised he would have somebody else meet with Miguel RODRIGUEZ.  Jose RODRIGUEZ asked, "Where you standing at?  What street?"  MORRISON replied, "Twelve and

a half." Jose RODRIGUEZ acknowledged. Case agents believe MORRSON advised he had $12,500 in drug-related proceeds for Jose RODRIGUEZ ("Twelve and a half."). At 10:57 a.m., MORRISON called CHRISTOPHER. CHRISTOPHER asked, "What time he say, 12:30? 1:00?" MORRISON advised he would call Miguel RODRIGUEZ and let CHRISTOPHER know.

76.     At 11:00 a.m., MORRISON, using Target Telephone #15, called Miguel RODRIGUEZ at (224) 436-4768. MORRISON asked, "What time you want to get up there?" Miguel RODRIGUEZ replied, "Well you tell me." MORRISON said, "Well, let's say... 'Cause I'm, uh, Rick gonna come up there 'cause I'm at the game. I'm at the Packers game. So, uh, Rick gonna go up there so he ready whatever time I would say, uh, say 12:00, 12:30." Miguel RODRIGUEZ confirmed, "Okay, 12:30. Okay, by the Wings." MORRISON reiterated, "12:30. Okay." Case agents know Miguel RODRIGUEZ often meets either MORRISON or MORRISON's associate to obtain drug-related proceeds, deliver narcotics and/or obtain returned poor quality narcotics at Buffalo Wild Wings located at 7114 118th Ave., Kenosha, Wisconsin. Therefore, case agents believe MORRISON planned on sending Ricky CHRISTOPHER to meet with Miguel RODRIGUEZ to deliver drug-related proceeds ("Rick gonna come up there."). Miguel RODRIGUEZ advised MORRISON that he would meet CHRISTOPHER at Buffalo Wild Wings at 12:30 p.m. ("Okay 12:30. Okay, by the Wings.").

77.     At 11:20 a.m. and 11:21 a.m., MORRISON, using Target Telephone #8, sent two text messages to CHRISTOPHER at (414) 914-1203 that read, "12:30" and "Bw3." At 11:54 a.m., CHRISTOPHER, using (414) 914-1203, sent a text message to MORRISON at Target Telephone #8 that read, "OK." Case agents know that BW3 is often used as shorthand to refer to Buffalo Wild Wings. Therefore, based on the aforementioned conversation between MORRISON and Miguel RODRIGUEZ, case agents believe MORRISON directed CHRISTOPHER to meet with

31

Miguel RODRIGUEZ at Buffalo Wild Wings at 12:30 p.m., and that CHRISTOPHER acknowledged.

78. On September 10, 2017, at 11:58 a.m., Jose RODRIGUEZ sent a text message to **MONARREZ JR.** at (773) 397-5623. Two days prior, on September 8, 2017, at 8:50 a.m., location data for this phone revealed that it was located in El Paso, Texas. This text message read, "Getting a check in a couple hrs. Will hit you up!" Based upon their training, experience, and familiarity with the investigation, case agents believed Jose RODRIGUEZ advised MONARREZ JR. that Jose RODRIGUEZ would be receiving drug-related proceeds and would contact **MONARREZ JR.** once the cash was in hand.

79. At 12:09 p.m., MORRISON called CHRISTOPHER. CHRISTOPHER stated, "Yo, it's going down." Case agents believe CHRISTOPHER advised he was on his way to meet with Miguel RODRIGUEZ.

80. At 12:45 p.m., Miguel RODRIGUEZ, using (224) 436-4768, called MORRISON at Target Telephone #15. Miguel RODRIGUEZ advised he just arrived at Buffalo Wild Wings. MORRISON said he told CHRISTOPHER to go inside Buffalo Wild Wings when CHRISTOPHER arrived. Miguel RODRIGUEZ stated he did not yet see CHRISTOPHER and instructed MORRISON to remind CHRISTOPHER to go inside once he arrived.

81. At 2:27 p.m., Miguel RODRIGUEZ, using (224) 436-4768, called Jose RODRIGUEZ at Target Telephone #9 and said, "I got it now." Jose RODRIGUEZ acknowledged and later instructed Miguel RODRIGUEZ to come to Jose RODRIGUEZ's residence. Case agents believe Miguel RODRIGUEZ called to advise Jose RODRIGUEZ that Miguel RODRIGUEZ had received the drug-related proceeds.

32

82.     At 3:30 p.m., Jose RODRIGUEZ, using Target Telephone #9, called **MONARREZ JR.** at (773) 397-5623.   **MONARREZ JR.** advised he was in town and approximately 45 minutes from Jose RODRIGUEZ's residence.   **MONARREZ JR.** asked, "What street are you on now?" Jose RODRIGUEZ replied, "I'm on…let me see, 17 buddy… Everything is accounted for.   It's just that I have to wait a little bit."   **MONARREZ JR.** replied, "Okay.   I have another trip to do up here north.   Can you hold onto it for Wednesday?"   Jose RODRIGUEZ advised he could and said, "…and maybe I'll have a little more chunk for you."   **MONARREZ JR.** stated he would call Jose RODRIGUEZ Wednesday.   Case agents believe Jose RODRIGUEZ called **MONARREZ JR.** to let **MONARREZ JR.** know he had drug-related proceeds ready for him.   **MONARREZ JR.** asked how much money Jose RODRIGUEZ possessed ("What street are you on now?") and RODRIGUEZ advised he had $17,000 ("I'm on…let me see. 17 buddy.").   **MONARREZ JR.** told RODRIGUEZ he would be coming to RODRIGUEZ's area the following Wednesday and asked RODRIGUEZ to hold onto the money until then ("Okay.   I have another trip to do up here north.   Can you hold onto it for Wednesday?").

83.     The following Wednesday, September 13, 2017, Jose RODRIGUEZ and **MONARREZ JR.** decided to meet the following day.   On September 14, 2017, Jose RODRIGUEZ, using (773) 807-9193, and **MONARREZ JR.**, using (773) 397-5623, spoke via telephone and **MONARREZ JR.** advised he was en route to Jose RODRIGUEZ's residence.   Case agents established surveillance at Jose RODRIGUEZ's residence at 4269 Ruby Street, Schiller Park, Illinois.   **MONARREZ JR.**, Samuel FLORES-MORALES, and an unknown female arrived in FLORES-MORALES' black Lincoln MKZ bearing Iowa registration EXN-463.   A review of Iowa Department of Transportation records revealed this vehicle to be registered to Melissa FLORES, FLORES-MORALES' wife.   The Lincoln pulled into the driveway, out of the view of

33

case agents. Approximately nine minutes later, **MONARREZ JR.**, FLORES-MORALES, and the unknown female departed the area in the Lincoln. Case agents followed the Lincoln until it pulled into the driveway at 1211 Grand Boulevard, Aurora, Illinois. Based on their training, experience, and familiarity with the investigation, case agents believe Jose RODRIGUEZ provided drug-related proceeds to **MONARREZ JR.**

84.    On this same date, after **MONARREZ JR.** left Jose RODRIGUEZ's house law enforcement authorities conducted a traffic stop of the Lincoln. The driver of the vehicle was identified as **Pedro MONARREZ JR.**, and the front seat passenger as Samuel MORALES-FLORES. MORALES-FLORES interjected during the traffic stop that his wife was the owner of the vehicle.

**D.  Pedro MONARREZ JR. as the user of (312) 273-3413 and (773) 397-5623**

85.    As stated above, in early December 2017, case agents initially believed the user of (312) 273-3413 and (773) 397-5623 was Samuel FLORES-MORALES.

86.    Case agents who were familiar with the intercepted calls between Jose RODRIGUEZ and (312) 273-3413 and between Jose RODRIGUEZ and (773) 397-5623 conducted a *Mirandized* interview of FLORES-MORALES after his arrest. During this interview, FLORES-MORALES denied any involvement in trafficking narcotics. Upon comparing the voice of FLORES-MORALES with the voice intercepted over (312) 273-3413 and (773) 397-5623, the case agents did not believe FLORES-MORALES was the user of either of these telephones.

87.    Also on December 6, 2017, case agents conducted an interview of Melissa Flores, the wife of FLORES-MORALES. Flores advised that FLORES-MORALES traveled to Chicago, Illinois without her in August or September of 2017 to visit **MONARREZ JR.** and Lorena Flores (**MONARREZ JR.'s** wife and FLORES-MORALES' sister), and an individual she only knows

34

as "Pepe." On that occasion, FLORES-MORALES traveled to Chicago, Illinois in their black Lincoln.

88.     Flores also said that she and FLORES-MORALES traveled to Florida and Las Vegas, Nevada together, but that they never traveled to Texas together. Furthermore, Flores said she did not believe FLORES-MORALES had ever visited Texas since she and FLORES-MORALES began dating in approximately 2007.

89.     Lastly, Flores advised that **MONARREZ JR.** and Lorena Flores previously lived in the Chicagoland area but moved to El Paso, Texas in 2014 or 2015.

90.     Case agents conducted additional follow-up investigation regarding the telephone numbers, and additional sources of information. More particularly, case agents conducted this additional follow-up to obtain additional evidence regarding the user (773) 397-5623 and (312) 273-3413.

91.     On March 22, 2018, case agents conducted interviews of Source of Information ("SOI") 9, 10, and 11, each of whom is familiar with both FLORES-MORALES and **MONARREZ JR.** and has engaged in multiple face-to-face conversations with them. SOI-9 identified the voice on intercepted calls from (773) 397-5623 as "100%" certain that the voice belonged to **MONARREZ JR.** SOI-9 also identified the voice on intercepted calls with (312) 273-3413 as that of **MONARREZ JR.**

92.     Case agents presented a photograph captured of the individual who exited the black Lincoln to meet with Jose RODRIGUEZ on August 18, 2017 as described above to SOI-9. SOI-9 said the individual "strongly resembled" **MONARREZ JR.** and advised that it was "definitely not" FLORES-MORALES. SOI-9 also recalled that FLORES-MORALES traveled to Chicago,

Illinois for a few days in mid-September 2017 to visit **MONARREZ JR.**, and that FLORES-MORALES drove the black Lincoln for that trip.

93.     SOI-9 did not know why **MONARREZ JR.** was driving the aforementioned Lincoln; however, SOI-9 did state that **MONARREZ JR.** was the previous owner of the vehicle and had sold it to FLORES-MORALES and Melissa Flores.  In addition, SOI-9 said that since Melissa Flores and FLORES-MORALES had purchased the car from **MONARREZ JR.** just prior to August 2017, **MONARREZ JR.** never drove the Lincoln outside the presence of FLORES-MORALES.

94.     SOI-10 also identified the voice intercepted over (773) 397-5623 and (312) 273-3413 as "100% confident" and "definitely" that of **MONARREZ JR.**

95.     SOI-11 advised that the voice intercepted over (312) 273-3413 "sounded like" **MONARREZ JR.**  In one call played for SOI-11, the user of (312) 273-3413 frequently used the phrase, "sounds good."  SOI-11 specifically stated that **MONARREZ JR.** often used this phrase in conversation.

96.     On March 2, 2018, and April 13, 2018, case agents conducted proffered debriefs of Miguel RODRIGUEZ.  During one of these debriefs, case agents showed Miguel RODRIGUEZ a photograph of the black Lincoln observed on August 18, 2017 at 7546 W. Addison Street, Chicago, Illinois.  Miguel RODRIGUEZ said he recognized the vehicle and advised that it previously belonged to Jose RODRIGUEZ.  Miguel RODRIGUEZ said Jose RODRIGUEZ told him that Jose RODRIGUEZ gave the vehicle to Jose RODRIGUEZ's narcotics source of supply to partially settle an outstanding drug debt.  As stated previously, SOI-9 advised that **MONARREZ JR.** subsequently sold the Lincoln to FLORES-MORALES and Melissa Flores.

97.     Case agents also obtained historical information pertaining to the location of telephones (773) 397-5623, (312) 273-3413 (the two telephone numbers intercepted with Jose RODRIGUEZ) and (319) 371-8617 (FLORES-MORALES' personal cell phone).

98.     On July 28, 2017, at approximately 11:04 a.m. FLORES-MORALES utilized his personal phone, (319) 371-8617, to place an outgoing call.  Information pertaining to the location of this telephone revealed it was located in Burlington, Iowa.  Also on July 28, 2017, at approximately 1:26 p.m., (312) 273-3413 received an incoming call.  Information pertaining to the location of this telephone revealed that it was located in El Paso, Texas.  Again, on July 28, 2017, at approximately 4:15 p.m., Jose RODRIGUEZ received a text message from (312) 273-3413 which read, "Como esta?"  Information pertaining to the location of (312) 273-3413 revealed it remained in El Paso, Texas.

99.     As indicated above, on August 22, 2017, Jose RODRIGUEZ received a text message from (773) 397-5623 which read, "New one."  On that date, information pertaining to the location of this telephone revealed it was in El Paso, Texas.  For this same date, location information for FLORES-MORALES' telephone revealed that it was in Burlington, Iowa.  Based upon a check of law enforcement data bases, case agents believe **MONARREZ JR.** resided in El Paso, Texas.  Specifically, a check with the Texas Department of Motor Vehicle's revealed that **MONARREZ JR.** listed an address in El Paso, Texas, as his residence.

100.     On August 30, 2017, at approximately 5:19 p.m. a call registered on FLORES-MORALES' telephone.  Location data indicated that FLORES-MORALES' telephone was located in Burlington, Iowa.  Also on August 30, 2017, at approximately 8:12 p.m., Jose RODRIGUEZ's cellular telephone was in contact with (773) 397-5623, during which time (773) 397-5623 was located in El Paso, Texas.

101.     In addition, historical location information revealed FLORES-MORALES' cellular telephone was not in Texas during the interception phase of this investigation.

**E. Pedro MONARREZ JR. as the user of Device A**

102.     On July 30, 2019, United States Magistrate Judge David E. Jones, Eastern District of Wisconsin, signed a criminal complaint and warrant authorizing the arrest of **MONARREZ JR.** for violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A) and 846, Distribution of, and Possession with Intent to Distribute, Controlled Substances and Attempt and Conspiracy to commit violations of Controlled Substances Offenses, including to Distribute and Possess with Intent to Distribute Controlled Substances.

103.     In March 2018 and July 2019, case agents conducted a query of the Texas Department of Transportation regarding Ana L. Monarrez (H/F, 10/13/86), the wife of Pedro **MONARREZ JR.** These records indicate that **MONARREZ JR.** that cell phone number (915) 703-8806 is listed as Ana Monarrez's emergency contact. Current telephone tolls revealed this phone number is no longer active.

104.     A search of a law enforcement database (CLEAR) on July 30, 2019, revealed a cell phone number of (915) 234-9834 (**Device A**) associated with **MONARREZ JR.** A search of (915) 234-9834 in Facebook.com, a commonly used social media site, revealed that the number is associated with the Facebook account of **"Pedro Monarrez."** The profile picture for this Facebook account depicts a photograph of a person I know to be **MONARREZ JR.**, as do additional photographs in this Facebook account. Case agents are familiar with **MONARREZ JR.** based upon this investigation, and from their review of a driver's license photograph of **MONARREZ JR.**

105.     Case agents also obtained telephone toll records for (915) 234-9834.  Case agents compared telephone records from (915) 324-9834 (**Device A**) with (915) 703-8806 and discovered 65 commonly contacted telephone numbers between the two telephones.

106.     In addition, records revealed (915) 234-9834, **Device A**, is subscribed to by Maria Herrera at 6405 Casper Ridge, El Paso, Texas.  Based upon their investigation, case agents know that 6405 Casper Ridge, El Paso, Texas was a former address associated with **MONARREZ JR.**

107.     On July 24, 2019, case agents also served an administrative subpoena on Commonwealth Edison Company for utilities information at 3320 Ronan Drive, Lake in the Hills, Illinois.  On July 30, 2019, case agents received the results of this subpoena.  A review of the information provided revealed that **MONARREZ JR.** is the subscriber for the utilities at 3320 Ronan Drive, Lake in the Hills, Illinois, which is an address associated with **MONARREZ JR.** In addition, the telephone number listed on this account for **MONARREZ JR.** is (915) 234-9834, **Device A**.  Based on the above information, case agents believe **MONARREZ JR.** next used **Device A**.

108.     On July 30, 2019, David E. Jones, United States Magistrate Judge in the Eastern District of Wisconsin signed a federal arrest warrant for the arrest of **MONARREZ JR.**

109.     On July 31, 2019, David E. Jones, United States Magistrate Judge signed an Order authorizing case agents to obtain information pertaining to the location of **Device A**.  On August 5, 2019, **MONARREZ JR.** was arrested at a port of entry in El Paso, Texas, as he attempted to cross from Mexico back into the United States.  On **MONARREZ JR.**'s person at the time of his arrest was **Device A**.  Case agents spoke with **MONARREZ JR.** who confirmed the number for **Device A** was (915) 234-9834.

110. An additional review of records pertaining to (915) 234-9834, **Device A**, revealed that the account was activated on October 24, 2017, during the authorized period of interception for Jose RODRIGUEZ and other DTO members. A review of telephone toll records revealed outgoing and incoming calls were made and received beginning on October 25, 2017. **Device A** placed outgoing calls to seven telephone numbers which contained Mexico country code prefixes. Your affiant knows that Mexico is a source country for heroin and cocaine. To this end, these seven numbers all connected to DEA drug cases. One of these seven numbers engaged in 14 conversations with **Device A**, all of varying durations. Specifically, this telephone number with the Mexico country code prefix was connected to a 2009 DEA case. This telephone number was in contact with Israel Aguirre-Carrete, listed as "a cocaine trafficker in the Chicago-area" and also in contact with a number "possibly being utilized by **Pedro Monarrez**, father-in-law of Israel Aguirre-Carrete, a cocaine broker in the Chicago area."

111. I also reviewed approximately the top 25 to 30 United States telephone numbers connected to **Device A** where outgoing calls were placed and incoming calls received. Of those top numbers, approximately nine numbers were connected to other DEA investigations.

112. All Subpoenaed records from AT&T also showed the IMSI (International Mobile Subscriber Identity) for the account of (915) 234-9834, was the same from October 24, 2017 through the date of **MONARREZ JR.'s** arrest on August 5, 2019.

113. Therefore, case agents believe **MONARREZ JR.** utilized **Device A** in addition to other cellular phones during the period of wire interception of Jose RODRIGUEZ and others, and continued to use **Device A** until his arrest.

114. Your affiant is aware, based on my training and experience, that drug traffickers often have multiple wireless phones. They may use one phone to contact customers and another

40

phone to contact suppliers. I am also aware that drug traffickers frequently store phone numbers of other drug traffickers, suppliers and customers in their phones' contact lists. I am also aware that drug traffickers frequently use text messages to convey information regarding drug transactions and may store sound, photo or video files of drugs, money or other items related to drug dealing in their wireless phones or other electronic devices.

115. I am also aware that drug traffickers frequently take photos or videos of themselves posing with large amounts of drugs, money, or firearms and show these photos or videos to other drug traffickers as a means of demonstrating their success at trafficking their drug of choice. I am aware that these photos or videos may be captured on wireless phones, tablets, and/or digital cameras and may be transferred or stored on additional electronic media including wireless phones, digital cameras, tablets, and computers.

116. Therefore, based upon the facts described above, I believe there exists probable cause to believe that a search of the information contained within the above described **Device A** will produce evidence of a crime, namely evidence related to the possession and trafficking of narcotics.

117. **Device A** is currently in the lawful possession of the Wisconsin Department of Justice, Division of Criminal Investigation (DCI). It came into DCI's possession during the execution of an arrest warrant on **MONARREZ JR.**

118. **Device A** is currently in storage at 801 W. Michigan Street, Milwaukee, Wisconsin. In my training and experience, I know that **Device A** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when **Device A** first came into the possession of DCI.

## **TECHNICAL TERMS**

119. Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable

43

storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

      f.     Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

      g.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      h.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

44

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

118.     Based on my training, experience, and research, I know that **Device A** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation devices, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

119.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

120.     There is probable cause to believe that things that were once stored on **Device A** may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by

45

an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

      d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    121.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Devices** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **Device A** because:

      a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of

46

peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  122. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Device A** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of

**Device A** to human inspection in order to determine whether it is evidence described by the warrant.

123. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Device A** described in Attachment A to seek the items described in Attachment B.

## ATTACHMENT A

The properties to be searched are described as follows:

   a.    A white iPhone 8 cellular telephone, IMSI number 310150925580514, hereinafter "**Device A**."

   b.    **Device A** is currently located at 801 W. Michigan Street, Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of **Device A** for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.     All records on **Device A** described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1) and 846, including, but not limited to:

     a.   lists of customers and related identifying information;

     b.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

     c.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

     d.   any information recording schedules or travel;

     e.   all bank records, checks, credit card bills, account information, and other financial records;

     f.   Photographs and/or video depicting possession of drugs and/or related to drug trafficking;

     g.   Records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

2.     Evidence of user attribution showing who used or owned **Device A** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

50
